# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 0:25-cv-60259-MD
### IN ADMIRALTY

ROBERT PIETZ,

      Plaintiff,

v.

Apple Inc.,

      Defendant.

_____/

```
FILED BY _____ D.C.

      APR 2 3 2025

   ANGELA E. NOBLE
  CLERK U.S. DIST. CT.
 S. D. OF FLA. - FT. LAUD.
```

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT TO CONFORM WITH SUPPLEMENTAL RULE C AND ALIGN WITH *IN REM* JURISDICTION ASSET FORFEITURE, AND ARREST PROTOCOLS

Plaintiff, Robert A. Pietz, appearing *pro se* and pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure and Supplemental Rule C(2) of the **Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions,** respectfully moves this Court for leave to amend his operative complaint. The amendment is sought for the limited purpose of: (i) conforming the pleading to the procedural requirements of a verified admiralty complaint under Supplemental Rule C, and (ii) substantiating the factual basis for *in rem* jurisdiction and aligning the operative pleading with the statutory prerequisites for asset forfeiture and arrest, such that the Clerk of Court and the United States Marshals Service (or other appropriate port authority) may issue and execute a warrant for the arrest of contested goods introduced into U.S. commerce under

unresolved legal title, as previously noticed in Plaintiff's Rule 9(h) designation. In support thereof,

Plaintiff states as follows:

## I. BACKGROUND ALLEGATIONS

1.      This action arises under the Copyright Act, 17 U.S.C. § 101 et seq., and was originally filed

on February 12, 2025.

2.      On April 21, 2025, Plaintiff submitted a supplemental designation under Rule 9(h),

invoking this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §§ 1333(1) and

1333(2), and asserting *in rem* authority over commercial goods introduced into U.S. commerce

under unresolved legal title.

3.      Plaintiff's designation was based on newly reported evidence—specifically, an April 10,

2025 Reuters article (attached as **Exhibit A**)—confirming that Defendant Apple Inc. coordinated

the shipment of approximately 600 tons of iPhones from India to the United States.

4.      The shipment represented an estimated $1.2 billion in declared import value and occurred

during the pendency of this litigation.

5.      Plaintiff alleges that these goods contain embedded copyrighted content whose ownership

remains contested in this action under 17 U.S.C. § 204(a).

6.      Apple has publicly admitted in its filings that it lacks a valid written assignment of title for

those works, yet continues to profit from the distribution and sale of products potentially bearing

unlawfully held content—while discovery remains stayed.

7.      Apple's posture in this litigation reflects a clear and consistent acknowledgment that it

lacks documentary evidence required by federal law to establish legal ownership of the

copyrighted works embedded in its products. Specifically:

- In its Motion to Dismiss [**ECF No. 14**], Apple asserts an implied transfer theory rather than

    presenting a written assignment;                                    2

- In its Motion to Stay Discovery [**ECF No. 19**], filed on March 17, 2025, Apple again fails to cure the evidentiary defect;

- And in its Reply in Support of Motion to Dismiss [**ECF No. 33**], filed April 18, 2025, Apple confirms it has no signed transfer of rights from the administratively dissolved predecessor entity, Apple Computer, Inc.

8.     Notwithstanding these explicit admissions, Defendant proceeded to import approximately 1.5 million iPhones across six cargo jets without verifying the legal status of the content embedded in those devices.

9.     The timing of the shipments—immediately prior to tariff enforcement—suggests a coordinated effort to front-load U.S. inventory under conditions designed to evade scrutiny and bypass legal formalities.

10.    Further exacerbating this conduct are disclosures in Apple's own Form 10-K[1] filings with the U.S. Securities and Exchange Commission, which consistently state that "substantially all" of Apple's inventory, product manufacturing, and final assembly are performed by third-party outsourcing partners located primarily in mainland China, India, Japan, South Korea, Taiwan, and Vietnam. These reports further confirm that Apple has outsourced "much of its transportation and logistics management" and "depends on third parties" for compliance, while retaining all commercial benefit from sales through its U.S. brand.

---

[1] **[1]:** See Apple Inc., *Form 10-K for the Fiscal Year Ended September 30, 2023*, filed with the U.S. Securities and Exchange Commission on November 3, 2023, at 4, 6, 28–31, 35, and 64 (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/320193/000032019323000106/aapl-20230930.htm). The filing confirms Apple's dependency on foreign manufacturing and third-party logistics, states that "substantially all of the Company's manufacturing is performed in whole or in part by third-party manufacturers," and discloses ongoing bond issuances and equity repurchase programs coordinated through major underwriters including Goldman Sachs and J.P. Morgan.

3

11.     This operational structure is not incidental. At the onset of the COVID-19 global pandemic—during the height of international supply chain disruption—Apple executed a multi-series bond issuance totaling approximately $5.45 billion, backed by 2025, 2030, 2050, and 2060 maturity notes (attached as **Exhibit B**).

12.     These long-range financial instruments, underwritten by Goldman Sachs, J.P. Morgan, HSBC, and others, underscore Apple's deliberate economic entrenchment in overseas logistics and long-horizon profit strategies—executed while avoiding U.S. production oversight and IP compliance.

13.     Apple's Form 10-K further admits that no single intellectual property right is "solely responsible for protecting the Company's products and services," a statement that effectively deprioritizes statutory compliance in favor of brand reputation and shareholder return.

14.     Accordingly, any ruling favorable to Plaintiff—absent enforceable in rem relief—would be rendered effectively moot.

15.     Apple holds no significant domestic manufacturing assets within U.S. jurisdiction, and its overseas vendors are beyond the compulsory reach of federal discovery, inspection, or attachment.

16.     These goods, while entering the United States for sale, remain structurally shielded from accountability by a web of offshoring, contract delegation, and litigation delay.

17.     This posture, executed under a discovery stay, exposes the weakness of traditional jurisdictional tools when confronted with corporate actors of Apple's scale and international reach.

18.     Plaintiff contends that *in rem* jurisdiction—exercised at the port of entry—is the only meaningful mechanism by which this Court may ensure legal accountability and preserve Plaintiff's rights under U.S. law.

## II. BASIS FOR AMENDMENT TO INVOKE *IN REM* AUTHORITY

1.      Supplemental Rule C(2) requires that a complaint in an *in rem* proceeding: (a) be verified; (b) describe with reasonable particularity the property that is the subject of the action; and (c) state that the property is within the district or will be while the action is pending. Plaintiff now seeks leave to amend the operative complaint to satisfy these procedural elements in full.

2.      Specifically, Plaintiff seeks to formally identify as the subject of this action approximately 600 tons of iPhones imported from India to the United States by Defendant Apple Inc., as reported in an April 10, 2025 Reuters article (attached as **Exhibit A**). These goods are alleged to contain embedded copyrighted works whose legal ownership remains unresolved under 17 U.S.C. § 204(a).

3.      Plaintiff's amended complaint will ensure compliance with all procedural elements required under Supplemental Rule C(2), including the verification requirement and the description of the property with reasonable particularity. With respect to the territorial requirement under Rule C(2)(c), Plaintiff will allege—based on currently available evidence—that the contested goods entered the jurisdiction of the Southern District of Florida.

4.      This assertion is further supported by Plaintiff's April 21, 2025 supplemental designation under Rule 9(h), invoking 28 U.S.C. §§ 1333(1) and 1333(2), following the discovery of Defendant's coordinated cross-border shipments during the pendency of this litigation.

5.      Plaintiff reserves the right to refine this allegation should jurisdictional discovery confirm a different port of entry.

6.      The requested amendment is necessary to preserve this Court's *in rem* jurisdiction over commercial goods introduced into the United States under unresolved legal title.

7.      Because Defendant has invoked a discovery stay and continues to assert ownership over the disputed intellectual property while simultaneously profiting from the distribution of goods

that embed those works, the only available mechanism to preserve Plaintiff's rights is through the procedural remedy afforded under Supplemental Rule C(3)—namely, the Court's authority to issue a warrant for the arrest of the property.

8.      Plaintiff is not at this time requesting that a warrant be issued, but seeks to ensure that the operative complaint complies with all procedural prerequisites such that the Court may exercise that authority, if necessary, at the appropriate time.

9.      This amendment thus functions as both a jurisdictional safeguard and a preservation mechanism to avoid mootness in the event of judgment.

10.     Additionally, amending the complaint to invoke in rem proceedings clarifies the scope of the litigation.

11.     It narrows the field of discovery to the goods introduced into U.S. commerce that bear the contested works, thereby addressing Defendant's objections to overbreadth while reinforcing the procedural integrity of the docket.

12.     It also resolves any ambiguity regarding the nature of relief sought—transitioning the case, in part, from a purely *in personam* copyright dispute to one that involves tangible property over which this Court may assert direct control.

13.     Defendant has now conceded in three separate filings—including its Motion to Dismiss [**ECF No. 14**], Motion to Stay Discovery [**ECF No. 19**], and Reply in Support of Motion to Dismiss [**ECF No. 33**]—that it lacks a signed, written transfer of title to the works in question, as required by 17 U.S.C. § 204(a).

14.     Despite this, Defendant continues to profit from the importation and sale of goods containing those works while invoking procedural mechanisms to foreclose discovery and inspection.

6

15.     The amendment therefore seeks not only procedural compliance, but a constitutionally sound and equitable means of preserving this Court's authority to adjudicate Plaintiff's claims on the merits.

16.     Moreover, the conduct at issue implicates national economic integrity. As reflected in Defendant's August 2020 Final Pricing Term Sheet (attached as **Exhibit B**), Apple issued over $5 billion in bonds at the onset of the COVID-19 pandemic—an event originating from the same foreign nation to which Apple has outsourced 100% of its manufacturing operations.

17.     These bonds were underwritten by Goldman Sachs, J.P. Morgan, Morgan Stanley, HSBC, and others, and structured to finance stock repurchases and balance sheet manipulation during a moment of global crisis.

18.     While the American public was suffering record economic losses and panic-selling their retirement portfolios, Apple was consolidating corporate control and executive equity positions—effectively leveraging the national emergency to repurchase its own shares, strengthen insider control, and double down on its reliance on foreign production networks.

19.     These actions are not those of a company aligned with the national interest.

20.     They are the actions of a private entity that has chosen to structure itself in a manner that insulates its profits from domestic scrutiny while enjoying the protections of U.S. law.

21.     Defendant's financial structure now operates as a reverse poison pill—deterring accountability through offshoring, discovery obstruction, and litigation complexity.

22.     Without admiralty oversight and *in rem* enforcement, there exists no viable mechanism by which this Court, or the public it serves, can ensure compliance with the rule of law.

23.     The relief requested herein is not merely procedural—it is foundational.

24.     It is a preservation of judicial reach in an era where transnational logistics and digital infringement increasingly operate beyond the borders of traditional enforcement.

### III.   LEGAL STANDARD

1.   Leave to amend should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2).

2.   This liberal standard applies with full force in admiralty proceedings, particularly where a plaintiff seeks to conform the pleadings to the procedural requirements of Supplemental Rules governing *in rem* actions. See *Foman v. Davis*, 371 U.S. 178, 182 (1962) (identifying the absence of undue delay, bad faith, or prejudice as the relevant factors in granting amendment); see also *Young v. City of Augusta*, 59 F.3d 1160, 1169 (11th Cir. 1995) (noting that Rule 15(a)'s purpose is to facilitate decisions on the merits rather than on pleadings technicalities).

3.   Courts routinely grant leave to amend admiralty complaints where the amendment is necessary to satisfy the requirements of Supplemental Rule C, such as providing a verified statement, identifying property with particularity, or establishing its presence within the district. See, e.g., *Merchs. Nat'l Bank of Mobile v. Dredge Gen. G.L. Gillespie*, 663 F.2d 1338, 1344 (5th Cir. 1981) (approving amendment of an in rem complaint to cure procedural deficiencies under the Supplemental Rules); *Silver Star Enters., Inc. v. M/V Saramacca*, 19 F.3d 1008, 1011 (5th Cir. 1994) (finding no abuse of discretion where the district court allowed amendment to identify the res and meet in rem procedural standards); *U.S. v. $38,000.00 in U.S. Currency*, 816 F.2d 1538, 1547 (11th Cir. 1987) (recognizing that technical deficiencies in in rem pleadings may be corrected by amendment in furtherance of equitable jurisdiction).

4.   Here, Plaintiff seeks amendment to formalize the identification of goods—namely, a shipment of approximately 600 tons of iPhones introduced into U.S. commerce following the April 10, 2025 events reported in **Exhibit A**—and to clarify their connection to the Southern District of Florida pursuant to Plaintiff's supplemental maritime jurisdiction designation under Rule 9(h), submitted on April 21, 2025.

8

5.      The proposed amendment serves the interests of justice, enables potential future in rem relief under Supplemental Rule C(3), and ensures that procedural requirements are satisfied in light of Defendant's ongoing importation of contested goods without a valid written copyright transfer, as required by 17 U.S.C. § 204(a).

## IV.   PLAINTIFF'S STANDING AND EQUITABLE BASIS FOR LEAVE TO AMEND

1.      Plaintiff, Robert Pietz, respectfully asserts that his standing to bring this action is grounded in Article III of the U.S. Constitution and reinforced by equitable principles including restitution and unjust enrichment.

2.      Plaintiff independently discovered a critical statutory and procedural defect in Defendant's intellectual property chain of title: the administrative dissolution of Apple Computer, Inc., followed by Apple Inc.'s failure to execute a written transfer of copyright ownership as required by 17 U.S.C. § 204(a).

3.      Defendant has conceded in three separate filings that it lacks a valid written assignment— thereby severing the legal foundation of its multibillion-dollar intellectual property portfolio and leaving ownership unresolved.

4.      Despite the materiality of this defect, Defendant has refused to engage in any settlement discussion or resolution effort.

5.      The only lawful way to cure this statutory failure is through a written § 204(a) transfer agreement retroactively executed between Apple Computer, Inc. and Apple Inc.

6.      Plaintiff is, at present, the **only person legally authorized** to execute such a retroactive transfer on behalf of Apple Computer, Inc., having lawfully reincorporated the entity.

7.      Executing that transfer would resolve this action and retroactively immunize Apple Inc. from legal exposure—past, present, and future—arising from enforcement of copyrights under defective title.

9

8.      Plaintiff lawfully reincorporated Apple Computer, Inc. in the State of Florida after auditing its dissolution paperwork and cross-referencing those records against U.S. Copyright Office filings, identifying gaps in statutory compliance.

9.      Plaintiff then completed a parallel process in California, activating a valid "doing business as" (DBA) registration under California law—thereby establishing legitimate federal standing grounded in both procedural integrity and statutory compliance.

10.     Plaintiff did all of this without institutional backing or legal counsel—navigating the California Secretary of State, the Florida Department of State, and the Copyright Office alone.

11.     Plaintiff then constructed and filed a federal lawsuit asserting a valid cause of action under the Copyright Act, while also invoking admiralty jurisdiction under Supplemental Rule C and 28 U.S.C. §§ 1333(1)-(2).

12.     There is no exclusive federal license governing maritime or *in rem* practice, and no statutory prohibition bars a pro se litigant from invoking such jurisdiction to protect proprietary interests. See *Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993).

13.     Plaintiff brought this action in his individual capacity, strictly within the limits of 28 U.S.C. § 1654, and has not asserted any claims for relief on behalf of the corporate entity itself. He has honored all ethical boundaries while advancing a novel federal claim.

14.     Plaintiff has incurred substantial personal and financial loss while pursuing this action, including the loss of his home, livelihood, and relocation across the country to continue prosecuting the matter in good faith.

15.     Despite uncovering a multibillion-dollar legal defect, Plaintiff has never sought to weaponize that discovery—he has not sought injunctive relief, asset seizures, or disruption to Apple's operations.

16.     Instead, Plaintiff offered Defendant a procedurally sound, ethically restrained, and mutually beneficial solution: execute the required § 204(a) transfer, cure the title defect, and settle the matter privately.

17.     That offer remains the **only viable lawful pathway** to shield Apple from catastrophic legal and financial exposure regarding its foundational IP assets.

18.     Plaintiff acknowledges that some of his informal email correspondence with defense counsel may raise concern about tone or formality. However, any perceived frustration or informality must be understood in the broader context.

19.     Plaintiff is a self-taught litigant who has been categorically ignored, undermined, and marginalized by a legal system that defers to form over substance—despite Plaintiff having read and applied the governing statutes and rules with a level of fluency rivaling those who have practiced for decades.

20.     While Plaintiff does not excuse any lapses in tone, he reaffirms that his motives remain grounded in lawful remedy, ethical resolution, and respect for the Court.

21.     Had Plaintiff been a licensed attorney executing this legal repair on behalf of a corporate client, he would be entitled to significant compensation through fees, contingency, or statutory relief.

22.     Instead, Plaintiff has been foreclosed from those mechanisms—and yet has delivered a legally viable cure to Apple's billion-dollar compliance failure.

23.     To permit Defendant to benefit from Plaintiff's work without compensation would violate every core tenet of equity. See *Lexmark*, 572 U.S. at 129; *Astoria Fed. Sav.*, 501 U.S. at 108.

24.     Equity does not permit a trillion-dollar corporation to receive such a benefit at no cost, while the individual who engineered the solution—without institutional support—receives nothing.

11

25.     Plaintiff's claim for unjust enrichment is not speculative. It is grounded in law, fact, and record. It may be resolved either through judicial determination or through a fair and appropriate settlement.

## V.      PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order:

1.      Granting Plaintiff leave to amend the operative complaint to conform with Supplemental Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions;

2.      Permitting Plaintiff to file a verified complaint that identifies with reasonable particularity the contested goods introduced into the United States under unresolved legal title;

3.      Acknowledging that such amendment preserves the Court's in rem jurisdiction and enables, if necessary, the issuance of a warrant for the arrest of property pursuant to Supplemental Rule C(3);

4.      Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Robert Pietz
Plaintiff, Pro Se
4229 ne suwannee dr
Lee's Summit MO, 64064
754-277-9578

Dated: April 22, 2025

**Extremely Urgent**

Visit UP...

**Appl...** this side.



S.BLUE S.RIGHT
45 - 1538
US FEDERAL BUILDING AND COURT H
299 E BROWARD BLVD
STE 108
FORT LAUDERDALE FL 33301

This envelope is for us...

ROBERT PIETZ
(754) 277-9578
THE UPS STORE #3255
923 NE WOODS CHAPEL RD
LEES SUMMIT MO 64064-1989

1.5 LBS LTR 1
SHP WT: 2 LBS
DATE: 22 APR

SHIP ATTN  CLERK OF COURTS
TO: US FEDERAL BUILDING AND COURT HOUSE
    STE 108
    299 E BROWARD BLVD

FORT LAUDERDALE FL 33301-1925

FL 333 0-



UPS NEXT DAY AIR          1

TRACKING #: 1Z 167 261 01 5862 6634

BILLING: P/P

REF #2: MMS          MM32591Y6Z9P6 18H 13.00C ZZP 450 12.60

**Domestic Shipments**

...qualify for the letter rate, UPS Express®...
...correspondence, urgent documents, and/or elec...
...oz. or less. UPS Express envelopes containing items...
...weighing more than 8oz. will be billed by weight.

**International Shipments**

...e UPS Express envelope may be used only for documents of no commercial
...lue. Certain countries consider electronic media as documents. Visit
...s.com/importexport to verify if your shipment is classified as a document.

...qualify for the letter rate, the UPS Express envelope must weigh 8 oz. or less.
...S express envelopes weighing more than 8 oz. will be billed by weight.

...e: UPS Express envelopes are not recommended for shipments of
...tronic media containing sensitive personal information or breakable items.
...ot send cash or cash equivalent.

**Window Envelope**

...e this envelope with shipping documents printed
...om a laser or inkjet printer on plain paper. Insert
...pping documents under window from the top.

...national Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/
...e Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention")
...Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or
...the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.